AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

<table>
<tr><td>

**LODGED**
CLERK, U.S. DISTRICT COURT

**01/25/2024**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DVE _____ DEPUTY

</td></tr>
</table>

<table>
<tr><td>

**FILED**
CLERK, U.S. DISTRICT COURT

**01/26/2024**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KH _____ DEPUTY

</td></tr>
</table>

United States of America

v.

PATRICK ALBERTO PEREZ-LUCIO,

Defendant.

Case No.  8:24-mj-00033-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of <u>January 24, 2024</u>, in the county of Orange in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*   ☒ Continued on the attached sheet.

/s/ Steven Paris
—————————————————
*Complainant's signature*

Steven Paris, Special Agent (DEA)
—————————————————
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  _____01/26/2024_____      /s/ Autumn D. Spaeth
—————————————————
*Judge's signature*

City and state:  <u>Santa Ana, California</u>      Hon. Autumn. D. Spaeth, U.S. Magistrate Judge
—————————————————
*Printed name and title*

RW:bm

## AFFIDAVIT

I, Steven Paris, being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.   I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA") and have been so employed since June 1992.  I am currently assigned to the Los Angeles Field Division, Orange County District Office.  During my employment with the DEA, I have received specialized drug trafficking investigation training, including on drug interdiction, wiretaps, money laundering, smuggling, financial investigations, controlled substance identification, physical and electronic surveillance, confidential source management, and undercover operations.  I have participated in numerous cases involving money laundering, drug trafficking, and the use of wire intercepts, search warrants, surveillance, and interviews of drug traffickers.  I am familiar with drug-trafficking methods of operation, including the distribution, storage, and transportation of controlled substances, the collection of proceeds of drug trafficking, and methods of money laundering. I am familiar with street terms involving controlled substances.

### II. PURPOSE OF AFFIDAVIT

2.   This affidavit is made in support of a criminal complaint against Patrick Alberto PEREZ-Lucio ("PEREZ") for violating Title 21, United States Code, Section 841(a)(1), (Possession with Intent to Distribute Methamphetamine).

1

3.    Unless otherwise stated: The facts set forth in this affidavit are based upon my personal observations; my training and experience; oral and written reports about this investigation; and physical surveillance conducted by federal agents or local law enforcement agencies, which has been reported to me either directly or indirectly.  When I assert that a statement was made, I have either heard the statement directly or listened to a recording of the statement, or the statement was reported to me by another law enforcement officer, either directly or in a written report.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaints and arrest warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  All conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>**SUMMARY OF PROBABLE CAUSE**</u>

4.    On January 24, 2024, the United States Border Patrol conducted an investigatory traffic stop of a vehicle in San Clemente, California.  PEREZ was the driver and the sole occupant of the vehicle.  In the course of the stop, officers searched the vehicle and found approximately 58 kilograms of suspected methamphetamine in the rear cargo compartment of the vehicle.  PEREZ later admitted that he had agreed to transport the methamphetamine from Chula Vista, California to Fresno, California in exchange for money.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

5.    Based upon my discussions with other federal and local law enforcement officers, and review of the Border Patrol reports, I know the following:

6.    At approximately 3:45 p.m., Border Patrol Agent Ramirez was driving northbound in a marked vehicle on the Interstate 5 freeway, approximately 7 miles south of the San Clemente Border Patrol checkpoint, which is south of San Clemente, California.  He observed a black, 2015 Volkswagen GTI bearing a Baja California, Mexico license plate.

7.    Agent Ramirez observed that the Volkswagen had a very dark tint on all of the windows, and that it was driving in a manner consistent with an attempt to avoid law enforcement detection.  Specifically, when the agent drove his vehicle next to the Volkswagen, he could see that the one occupant, a male driver, had his arms locked, rigid, and placed on the steering wheel in the "10 and 2" position.  Although Agent Ramirez was driving in parallel with the Volkswagen for a few minutes, the driver did not look in his direction.  In Agent Ramirez's experience, this behavior is commonly exhibited by smugglers of illicit contraband while in transit.  When a motorist engaged in legitimate travel is paced by a marked law enforcement vehicle, it is usually a matter of seconds before the motorist looks in the direction of the law enforcement vehicle.  Drivers who are engaged in alien and/or contraband smuggling often deliberately avoid making eye contact with law enforcement out of fear of drawing attention to themselves.

8.    Agent Ramirez further observed the Volkswagen traveling closely behind a white Chevrolet Suburban with Mexican plates.  The Volkswagen in turn was closely followed by a black, older model sedan, driven by a young Hispanic male.  This was significant to Agent Ramirez because, based on his training and experience, smugglers often work together using multiple vehicles.  It is common for smugglers to use vehicles to scout for law enforcement during their travel, and to have other vehicles guarding and overseeing the load vehicle that contains the contraband, so that the contraband does not get stolen.

9.    Agent Ramirez slowed down in the number two lane about three car lengths from the Volkswagen to make further observations.  The Chevrolet activated its right signal and transitioned to the number two lane.  Simultaneously, the Volkswagen and the black sedan transitioned to the number two lane as well, keeping the Volkswagen in the middle of what appeared to the agent to be a convoy.

10.   The agent then sped up and moved to the number three lane to conduct record checks on the Chevrolet's Mexican plate. The Chevrolet was associated with an address in Chula Vista that was associated with drug smuggling.

11.   The Chevrolet then abruptly sped away from the convoy, continuing in the number two lane.  The Volkswagen and the black sedan slowed to where they were behind the agent.  In Agent Ramirez's experience, scout vehicles will sometimes intentionally draw attention to themselves by speeding away, in order to distract law enforcement from the vehicle that contains

contraband.  Accordingly, Agent Ramirez decided not to follow
the Chevrolet, but instead to get behind the Volkswagen.  As
Agent Ramirez tried to position his vehicle behind the
Volkswagen, the black sedan that was following the Volkswagen
sped up and did not allow Agent Ramirez to get behind the
Volkswagen.

12.  Agent Ramirez then positioned his vehicle behind the
black sedan to conduct record checks on the sedan's license
plate.  While he was doing so, the black sedan suddenly changed
to the number one lane without activating its turn signal and
sped away.  Agent Ramirez believed that the sedan was using the
same diversionary tactic as the Chevrolet, attempting to draw
the agent's attention away from the Volkswagen.

13.  Agent Ramirez again reduced his speed to position his
vehicle behind the Volkswagen.  As he did so, the Volkswagen
also slowed down significantly, so that it was traveling slower
than the flow of traffic.  Based on his training and experience,
Agent Ramirez knew that drivers with contraband commonly drive
in an overly cautious manner to avoid getting stopped by law
enforcement.

14.  Agent Ramirez checked the Volkswagen's international
border crossing history.  It had crossed that day, January 24,
2024, at approximately 12:09 p.m., through the San Ysidro Port
of Entry.  The vehicle's listed driver was Patrick Alberto PEREZ
Lucio, a Mexican national with a visa allowing him to be in the
United States for business and/or pleasure.  Agent Ramirez
noticed that there was an approximately four-hour delay from the

5

time the Volkswagen crossed the border to its current location. Had the Volkswagen driven directly from the border, it would have taken about an hour.  In Agent Ramirez's experience and training, such a delay after crossing the Mexico-U.S. border was common to smugglers, in order to distance themselves from their border crossing.

15.  Record checks further revealed PEREZ applied for and received Form I-94, Arrival/Departure record.  The destination on the application stated Hesperia, California.  This struck Agent Ramirez because Hesperia is near the Interstate 15 freeway.  The direct route to Hesperia from the border would be the I-15, not the I-5 freeway.  In his experience, smugglers will often use fictitious addresses on the I-94 to conceal their true destination.

16.  Based on the events described, as well as his training and experience, Agent Ramirez believed the Volkswagen was involved in smuggling.  At approximately 4:03 p.m., he initiated a vehicle stop of the Volkswagen, which stopped near the offramp of Avenida Magdalena in San Clemente, Orange County, California, approximately 9 miles from the initial encounter.

17.  Agent Ramirez approached the vehicle and identified himself as a Border Patrol Agent.  PEREZ said he was the owner of the vehicle.  PEREZ said he was traveling to Fresno to see a friend he had not seen in a long time.  PEREZ said he had no luggage, no extra clothes, and was planning on returning to Mexico the same night.  Agent Ramirez found this unusual because Fresno, California is approximately 350 miles north of San

6

Diego, and an approximately 7-hour drive from the border.  It
did not make sense to Agent Ramirez that PEREZ would make such a
long trip without a change of clothes or travel essentials.  In
his experience, Agent Ramirez had encountered and apprehended
smugglers who lied about their true destination to avoid
disclosing the routes of the smuggling organization.

18.  Agent Ramirez asked PEREZ for consent to search his
vehicle.  PEREZ stated in Spanish that he would consent "if that
was necessary."  Agent Ramirez then advised PEREZ that he was
going to request a Border Patrol K-9.

19.  At approximately 4:14 p.m., Border Patrol Agent Gomes
arrived with his K-9 partner "Mya."  Agents Ramirez and Gomes
asked if everything in the car belonged to PEREZ, who replied,
"yes."  They asked if PEREZ was responsible for everything in
the vehicle and he stated, "yes."

20.  Agent Gomes asked PEREZ if he could search the
vehicle's interior, exterior, and trunk.  PEREZ stated, "No, you
can search the outside, though."  Agent Gomes asked PEREZ if he
could conduct a canine search of the vehicle, to which PEREZ
replied, "Not inside, but you can search the outside."

21.  Agent Gomes explained to PEREZ that he was going to
conduct a "sniff" of the outside, but the canine's alert would
give the agents probable cause to search the inside of the
vehicle.  Agent Ramirez asked PEREZ if he had anything in the
vehicle that was illegal.  PEREZ stated he had an electronic
marijuana pen in the front of the vehicle.

22.  The K-9 alerted to the outside of the passenger side of the vehicle.  Agent Ramirez then searched the interior.  In the rear cargo area were six trash bags containing bags of a crystalline substance resembling methamphetamine.  PEREZ was arrested, and he and the Volkswagen were transported to the San Clemente Border Patrol Station for further investigation.

23.  In the six trash bags were 56 vacuum-sealed bags of the crystalline substance.  Agent Rodriguez tested the bags with a TruNarc handheld narcotics analyzer.  The TruNarc positively identified the crystalline substance as methamphetamine.  The weight of the 56 bags was 58.05 kilograms.

24.  At approximately 6:45 p.m., I interviewed PEREZ as Agent Rodriguez translated.  Prior to the interview, PEREZ was advised of his Miranda Rights and signed a waiver.  The advisement and the interview were recorded.

25.  During the interview, PEREZ told us the following:

a.  Prior to departing Tijuana for Fresno, he was asked by his friend "Fernando" to deliver a package to the Fresno area.  PEREZ agreed and Fernando directed him to go to a Dollar Tree store in Chula Vista after he crossed into the United States at the San Ysidro Port of Entry.

b.  After PEREZ parked in the Dollar Tree parking lot, a man tapped on PEREZ's window and stated that he was "Fernando's friend."  The man told PEREZ to open his trunk, at which time the "packages" were placed in PEREZ's vehicle.

c.  After the man departed, PEREZ went to the trunk to adjust the position of the items.  PEREZ observed that the

packages contained what he believed were illegal drugs.   PEREZ
called Fernando, who said he would pay PEREZ $2,000 to transport
the drugs to the Fresno area.   Fernando did not give him an
exact destination, but told PEREZ to call back when he was
closer and he would be given more specific directions for
delivering the drugs.

   d. PEREZ stated that prior to making the trip, he
had known Fernando for approximately a year.   PEREZ suspected
Fernando of being a drug dealer based on his flashy jewelry, his
Maserati vehicle, and having seen Fernando with gold-plated
pistols with diamond-encrusted grips and an AK-47-type rifle.
PEREZ saw Fernando provide cocaine to friends numerous times at
nightclubs.

  26. DEA agents conducted an independent TruNarc test with
a different device than the one used by the Border Patrol
agents.   This TruNarc also positively identified the crystalline
substance inside the bags as methamphetamine.

//

//

## **CONCLUSION**

27.  For the reasons described above, there is probable cause to believe that Patrick Alberto PEREZ-Lucio violated Title 21, United States Code, Section 841(a)(1) (Possession with Intent to Distribute Methamphetamine).


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 26th day of
January 2024


    /s/ Autumn D. Spaeth
UNITED STATES MAGISTRATE JUDGE